**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT MAY BE REVISED PRIOR TO THE COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| Morris Brown College, | : | |
| | : | Case No. 12-71188-BEM |
| Debtor. | : | |
| | : | |

## SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED DECEMBER 21, 2104

117388475_5

/s/      John A. Moore
John A. Moore (Ga. Bar No. 519792)
The Moore Law Group, LLC
1745 Martin Luther King Jr., Dr.
Atlanta, GA 30314
Telephone: (678) 288-5600
Facsimile: (888) 553-0071

Local Counsel for Debtor and Debtor in
Possession


/s/    Anne M. Aaronson
DILWORTH PAXSON LLP
Anne M. Aaronson (Pa. Bar No. 82118)
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 575-7200

Lead Counsel for Debtor and Debtor in
Possession

Dated:  December 21, 2014

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS SECOND AMENDED DISCLOSURE STATEMENT (THE, "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED DECEMBER 21, 2014, FILED BY MORRIS BROWN COLLEGE, DEBTOR AND DEBTOR IN POSSESSION (AS MAY BE AMENDED IN ACCORDANCE WITH THE TERMS THEREOF AND APPLICABLE LAW, THE "PLAN").  THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS.  EXCEPT WITH RESPECT TO THE FINANCIAL PROJECTIONS SET FORTH IN APPENDIX B ANNEXED HERETO (THE "PROJECTIONS") AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTOR DOES NOT UNDERTAKE ANY OBLIGATION TO, AND DOES NOT INTEND TO, UPDATE THE PROJECTIONS; THUS, THE PROJECTIONS WILL NOT REFLECT THE IMPACT OF ANY SUBSEQUENT EVENTS NOT ALREADY ACCOUNTED FOR IN THE ASSUMPTIONS UNDERLYING THE PROJECTIONS.  FURTHER, THE DEBTOR DOES NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES.  ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.  MOREOVER, THE PROJECTIONS ARE BASED ON ASSUMPTIONS THAT, ALTHOUGH BELIEVED TO BE REASONABLE BY THE DEBTOR, MAY DIFFER FROM ACTUAL RESULTS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND NON-BANKRUPTCY PROCEEDINGS OR THREATENED ACTIONS INVOLVING THE DEBTOR OR ANY OTHER PARTY, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE.

THE DEBTOR BELIEVES THAT THE PLAN WILL ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR, ITS CREDITORS AND ITS ESTATE.  THE DEBTOR URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.

*[Remainder of Page Intentionally Left Blank.]*

2

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.    OVERVIEW OF THE PLAN ..................................................................................1

    A.    General Structure of the Plan..............................................................................2
    B.    Summary of Treatment of Claims under the Plan ..............................................2

III.    PLAN VOTING INSTRUCTIONS AND PROCEDURES ....................................9

    A.    Notice to Holders of Claims ..............................................................................9
    B.    Voting Rights ....................................................................................................10
    C.    Solicitation Materials .......................................................................................10
    D.    Voting Procedures, Ballots and Voting Deadline ............................................11
    E.    Confirmation Hearing and Deadline for Objections to Confirmation .............12

IV.    GENERAL INFORMATION CONCERNING THE DEBTOR ..........................12

    A.    Overview...........................................................................................................12
    B.    History..............................................................................................................13
    C.    Management and Employees ............................................................................13
        1.    Management ...........................................................................................13
        2.    Employees ..............................................................................................14
    D.    Summary of Assets ...........................................................................................14
    E.    Historical Financial Information.......................................................................14
    F.    The Debtor's Annual Operating Support ..........................................................15
    G.    Events Leading to the Commencement of the Chapter 11 Case........................15

V.    THE CHAPTER 11 CASE ...................................................................................16

    A.    Continuation of Operations; Stay of Litigation ...............................................16
    B.    First Day Motions ............................................................................................16
    C.    Retention of Professionals ...............................................................................16
    D.    Appointment of Creditors' Committee .............................................................17
    E.    Significant Post-Petition and Restructuring Events..........................................17
        1.    Payment of Trust Fund Taxes ................................................................17
        2.    Tax Exempt Status .................................................................................17
        3.    Proposed Sale of Certain Assets ...........................................................17
        4.    Sale of Certain Debt...............................................................................19
        5.    Debtor In Possession Financing .............................................................19

VI.    SUMMARY OF THE PLAN .................................................................................19

    A.    Overall Structure of the Plan............................................................................20
    B.    Classification and Treatment of Claims............................................................20
        1.    Treatment of Unclassified Claims under the Plan ...................................21
        2.    Treatment of Classified Claims under the Plan.......................................22
    C.    Reservation of Rights Regarding Claims..........................................................22
    D.    Allowed Claims, Distribution Rights and Objections to Claims .......................23
        1.    Allowance Requirement .........................................................................23

i

|  |  | 2. | Timing of Distributions | 23 |
|  |  | 3. | Making of Distributions | 23 |
|  |  | 4. | Failure to Negotiate Checks/Unclaimed Distributions | 24 |
|  |  | 5. | Objection Procedures | 25 |
|  | E. | | Disposition of Executory Contracts and Unexpired Leases | 25 |
|  |  | 1. | Contracts and Leases Deemed Rejected | 25 |
|  |  | 2. | Schedule of Executory Contracts and Unexpired Leases | 26 |
|  |  | 3. | Assumption and Rejection Procedures and Resolution of Treatment Objections | 26 |
|  |  | 4. | Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases | 27 |
|  |  | 5. | Modifications, Amendments, Supplements, Restatements or Other Agreements | 27 |
|  | F. | | Means for Implementation of the Plan | 27 |
|  |  | 1. | Continued Existence/Structure | 27 |
|  |  | 2. | Restructuring Distributions | 28 |
|  | G. | | Confirmation and/or Consummation | 28 |
|  |  | 1. | Requirements for Confirmation of the Plan | 28 |
|  |  | 2. | Conditions to Confirmation Date and Effective Date | 29 |
|  | H. | | Effects of Confirmation | 29 |
|  |  | 1. | Vesting of Assets | 29 |
|  |  | 2. | Injunction | 29 |
|  |  | 3. | Releases and Discharge Injunction | 30 |
|  |  | 4. | Clark Atlanta University Reversionary Interest | 32 |
|  |  | 5. | No Successor Liability | 32 |
|  | I. | | Retention of Jurisdiction | 32 |
|  | J. | | Amendment, Alteration and Revocation of Plan | 33 |
|  | K. | | Plan Implementation Documents | 33 |
| VII. | | | CERTAIN RISK FACTORS TO BE CONSIDERED | 34 |
|  | A. | | General Considerations | 34 |
|  | B. | | Certain Bankruptcy Considerations | 34 |
|  | C. | | Claims Estimations | 34 |
|  | D. | | Conditions Precedent to Consummation | 34 |
|  | E. | | Inherent Uncertainty of Financial Projections | 34 |
|  | F. | | Certain Tax Considerations | 35 |
| VIII. | | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 35 |
|  | A. | | U.S. Federal Income Tax Consequences to the Debtor | 36 |
|  | B. | | U.S. Federal Income Tax Consequences to Claim Holders | 36 |
|  | C. | | Other Tax Matters | 37 |
|  |  | 1. | Information Reporting and Backup Withholding | 37 |
|  |  | 2. | Importance of Obtaining Professional Tax Assistance | 38 |
| IX. | | | FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS | 38 |
|  | A. | | Feasibility of the Plan | 38 |

ii

| | B. | Acceptance of the Plan | 40 |
| | C. | Best Interests Test | 40 |
| | D. | Liquidation Analysis | 41 |
| | E. | Application of the "Best Interests" of Creditors Test | 41 |
| | F. | Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative | 41 |
| X. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 42 |
| | A. | Alternative Plan(s) of Reorganization | 42 |
| | B. | Liquidation | 43 |
| XI. | | THE SOLICITATION; VOTING PROCEDURES | 43 |
| | A. | Parties in Interest Entitled to Vote | 43 |
| | B. | Classes Entitled to Vote to Accept or Reject the Plan | 43 |
| | C. | Solicitation Order | 44 |
| | D. | Waivers of Defects, Irregularities, Etc. | 44 |
| | E. | Withdrawal of Ballots; Revocation | 44 |
| | F. | Voting Rights of Disputed Claimants | 45 |
| | G. | Further Information; Additional Copies | 45 |
| | | RECOMMENDATION AND CONCLUSION | 45 |

117388475_5

# I.  INTRODUCTION

The debtor and debtor in possession in the above-referenced chapter 11 case (the "Chapter 11 Case") is Morris Brown College ("MBC" or the "Debtor").  This chapter 11 case was commenced by voluntary petition on August 25, 2012 (the "Petition Date").

The Debtor submits this disclosure statement (as may be amended, the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code for use in the solicitation of votes on the Plan dated as of December 21, 2014 (as may be amended).  A copy of the Plan is attached hereto as Appendix A.  Each capitalized term used in this Disclosure Statement but not otherwise defined herein has the meaning ascribed to such term in the Plan.  In addition, all references in this Disclosure Statement to monetary figures refer to United States currency, unless otherwise expressly provided.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, its reasons for seeking protection and reorganization under chapter 11 and significant events that have occurred during the Chapter 11 Case.  This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

By order entered on January __, 2015, the Bankruptcy Court has approved this Disclosure Statement as containing "adequate information," in accordance with section 1125 of the Bankruptcy Code, to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtor to make an informed judgment as to whether to accept or reject the Plan, and has authorized its use in connection with the solicitation of votes with respect to the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In voting on the Plan, Holders of Claims entitled to vote should not rely on any information relating to the Debtor and its operations, other than that contained in this Disclosure Statement, the Plan, and all exhibits and appendices hereto and thereto.

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Interests that are (a) "impaired" by a plan and (b) entitled to receive a distribution under such plan are entitled to vote on the plan.  In the Debtor's case, Claims in Classes 2 through 7 are Impaired by and entitled to receive a distribution under the Plan; accordingly, only the Holders of Claims in those Classes are entitled to vote to accept or reject the Plan.  Claims in Class 1 are Unimpaired by the Plan; accordingly, the Holders thereof are conclusively presumed to have accepted the Plan.  The Debtor has no Class of Interests because no person nor entity holds an equity interest in the Debtor.

# II.  OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan.  For a more detailed description of the terms

and provisions of the Plan, see Article VI of this Disclosure Statement, entitled "Summary of the Plan."

The Plan provides for the classification and treatment of Claims against the Debtor. The Plan designates seven Classes of Claims. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims.

**A.     General Structure of the Plan**

The Plan contemplates the reorganization of the Debtor and the resolution of all outstanding Claims against the Debtor. Subject to the specific provisions set forth in the Plan, all Claims will be satisfied by payments to be issued by or on behalf of the Debtor. Because the Debtor is a non-profit corporation and no person nor entity holds an equity interest in the Debtor, there are no Interests in it to be cancelled.

The Debtor has estimated the ultimate distributions that will be made in respect of Allowed Claims. As explained more fully in Section VII entitled "Certain Risk Factors to Be Considered," however, because of inherent uncertainties, many of which are beyond the Debtor's control, there can be no guaranty that actual performance will meet the Debtor's estimates. The Debtor nonetheless believes that if the Plan is not consummated, it is likely that Holders of Claims against the Debtor's estate will receive less than they would if the Plan is confirmed because dismissal of this Chapter 11 Case and subsequent dissolution of the Debtor's organization will not result in a higher distribution to any Class of Claims or Interests. Similarly, if the Debtor's organization was a for-profit entity that could be involuntarily liquidated under chapter 7 of the Bankruptcy Code, liquidation of the Debtor's assets will not result in a higher distribution to any Class of Claims.

**B.     Summary of Treatment of Claims under the Plan**

The table below summarizes the classification and treatment of the prepetition Claims against the Debtor under the Plan. For certain Classes of Claims, estimated percentage recoveries are also set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions, including the amount of Allowed Claims in each Class.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. Except for Claims Allowed by the Plan, estimated Claim amounts for each Class set forth below are based upon the Debtor's review of its books and records and Claims filed to date in this case, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated. Accordingly, for these reasons, no representation can be or is being made with respect to whether the estimated percentage recoveries shown in the table below for Class 7 will actually be realized by the Holders of Allowed Claims in such Class.

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| **Unclassified — Administrative Claims**<br><br>Estimated Aggregate Allowed Amount:  Approximately $2,600,000*<br><br><br>*Amount includes known Administrative Claims estimated as of the date of the filing of this Disclosure Statement and extending through December 31, 2014, plus approved and anticipated professional fees, less an agreed upon reduction of up to 20% by professionals.  This amount is inclusive of amounts contemplated to be distributed pursuant to the Cash Collateral Stipulation, filed on December 21, 2014, which is subject to approval by the Bankruptcy Court. | An Administrative Claim is a Claim for (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of the Chapter 11 Case asserted or arising under sections 503, 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary post Petition Date cost or expense of preserving the Debtor's Estate or operating the organization of the Debtor, (ii) any post Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtor in the ordinary course of its operations, and the debtor-in-possession funding made available to the Debtor by The African Methodist Episcopal Church, Inc., to the extent approved by the Bankruptcy Court and utilized by the Debtor, (iii) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code, and (iv) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546 of the Bankruptcy Code, and (b) any fees or charges assessed against the Debtor's Estate under section 1930 of title 28 of the United States Code.<br><br>Under the Plan, Administrative Claims are Unimpaired.  Unless otherwise provided for therein, each Holder of an Allowed Administrative Claim (except the debtor-in-possession funding made available to the Debtor by The African Methodist Episcopal Church, Inc., which is being paid in full as a Class 2 claim) shall receive, from the Carve Out, in full satisfaction, settlement, release, extinguishment and discharge of such Claim:  (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtor and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtor, or as the Bankruptcy Court may order.<br><br>Administrative Claims are not classified and are treated as required by the Bankruptcy Code.  The Holders of such Claims are not entitled to vote on the Plan.<br><br>With respect to the distribution of the Proceeds which |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | are being used to fund the Plan, all professionals (other than JLL) retained by the Debtor and the Committee in this Chapter 11 Case have agreed to waive up to 20% of their respective approved professional fees and expenses.<br><br>Estimated Percentage Recovery: 100% |
| **Unclassified — Priority Tax Claims**<br><br>Estimated Aggregate Filed Amount: $59,500.  The actual distribution will be resolved through the claims allowance process. | The Plan defines Priority Tax Claims as any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.  Such Priority Tax Claims include Claims of governmental units for taxes owed by the Debtor that are entitled to a certain priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.  The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements set forth in section 507(a)(8)(A) of the Bankruptcy Code, (b) property taxes meeting the requirements of section 507(a)(8)(B) of the Bankruptcy Code, (c) taxes that were required to be collected or withheld by the Debtor and for which the Debtor is liable in any capacity as described in section 507(a)(8)(C) of the Bankruptcy Code, (d) employment taxes on wages, salaries or commissions that are entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code, to the extent such taxes also meet the requirements of section 507(a)(8)(D), (e) excise taxes of the kind specified in section 507(a)(8)(E) of the Bankruptcy Code, (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) of the Bankruptcy Code and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G) of the Bankruptcy Code.<br><br>Under the Plan, Priority Tax Claims are Unimpaired.  Each Holder of an Allowed Priority Tax Claim shall receive, from the Carve Out and at the option of the Debtor, in full satisfaction, settlement, release, extinguishment and discharge of such Priority Tax Claim:  (a) the amount of such unpaid Allowed Priority Tax Claim in Cash or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtor and the Holder of such Priority Tax Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax |

4

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | Claim and the Debtor, or as the Bankruptcy Court may order. Prior to the Effective Date, the Debtor, shall have the right to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature.<br><br>    Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code.  The Holders of such Claims are not entitled to vote on the Plan.<br><br>    Estimated Percentage Recovery:  100% of Allowed Amount |
| **Class 1 —Priority Claims**<br><br>Estimated Aggregate Allowed Amount:  $337,000 |    Class 1 consists of Priority Claims, which are Claims against the Debtor entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than Priority Tax Claims or Administrative Claims.  Class 1 largely consists of Employee claims for work performed for or on behalf of Debtor within the 180 days prior to the Petition Date.<br><br>    Under the Plan, Class 1 Priority Claims are Unimpaired.  Each Holder of an Allowed Class 1 Priority Claim shall receive, from the Carve Out, in full satisfaction, settlement, release, extinguishment and discharge of such Claim:  (a) the amount of such unpaid Allowed Claim on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Class 1 Priority Claim becomes Allowed, and (iii) a date agreed to by the Debtor and the Holder of such Class 1 Priority Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Class 1 Priority Claim and the Debtor.<br><br>    Estimated Percentage Recovery:  100% of Allowed Amount |
| **Class 2 — African Methodist Episcopal Church, Inc. Secured Claims**<br><br>Total Claim Amount: $18,100,000 (inclusive of AME's prepetition debt as to a portion of which Citizens Trust Bank serves as the Indenture Trustee, AME's debtor-in-possession financing that is being |    Class 2 consists of (a) the pre-petition claims of the African Methodist Episcopal Church, Inc. that are secured by certain parcels of real property and as to a portion of which Citizens Trust Bank acts as Indenture Trustee, (b) the claims originally held by U.S. Bank, National Association, as Indenture Trustee on behalf of GTAS Solutions that are secured by Debtor's real property generally, and (c) debtor-in-possession financing advanced by AME to the Debtor post-petition.<br><br>    The Holder of a Class 2 Claim shall have an Allowed |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| paid in full as an unclassified administrative claim, and the claims originally held by U.S. Bank, National Association, as Indenture Trustee, on behalf of GTAS Solutions, which claims were acquired by AME on November 4, 2013) | Secured Claim in the aggregate amount of $18,100,000, inclusive of the unclassified Administrative Claim relating to the debtor-in-possession financing (the "Class 2 Allowed Claim Amount"). The Holder of a Class 2 Claim shall receive from the Sale Proceeds, a total of $10,500,000 on or before the Effective Date of the Plan, inclusive of the repayment of AME's debtor-in-possession financing that is being paid as an unclassified Administrative Claim and inclusive of any amounts paid to AME and/or the Indenture Trustee pursuant to the Cash Collateral Stipulation filed on December 21, 2014, which is subject to approval of the Bankruptcy Court. The obligations to repay the remaining balance of the Class 2 Allowed Secured Claim shall be evidenced by a promissory note made by the Debtor and Reorganized Debtor in favor of the Holder of a Class 2 Claim (the "Note"). The Holder of a Class 2 Claim shall provide the Carve Out so that distributions may be made from the Sale Proceeds to fund distributions to Allowed unclassified claims and Holders of Allowed Claims in Class 1 and Classes 4 through 7, pursuant to the Plan.<br><br>Notwithstanding anything to the contrary herein, in addition to the cash distribution to AME provided under this Plan, AME and the Indenture Trustee will retain their security interest in the campus property that was not sold pursuant to 11 U.S.C. § 363(b), unaffected by the Debtor's bankruptcy case. This "carried interest" shall be in the amount of $3,500,000 and shall secure a portion of the Debtor's remaining obligation to AME. The obligation shall be further evidenced by a Secured Promissory Note that provides that no principal or interest will become due until the earlier of 2.5 years post-emergence or 6 months following accreditation (the "Forbearance Period"). Unless voluntarily paid earlier by the Debtor, payment of interest that accrues during the Forbearance Period ("Accrued Interest") shall commence on the 1st day of the month following the end of the Forbearance Period (the "First Interest Payment Date") and shall be amortized over a period commencing with the First Interest Payment Date and ending 120 months after the date the note is executed and delivered (the " Maturity Date") of the Note. Interest will accrue at the federal judgment rate of interest or 7.375% per annum, whichever is higher.<br><br>The Debtor shall retire this carried interest and obtain a release of the interest by, beginning no later than the earlier |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | of 2.5 years post-emergence or 6 months following accreditation, making an annual payment to AME equal to 25% of the Debtor's excess revenues over expenditures for each year until such time as amounts due under the Secured Promissory Note are repaid in full.<br><br>Alternatively, the Debtor may pay off the Secured Promissory Note by:<br><br>(a) within thirty six months of the effective date of the Plan, paying a lump sum of $1,000,000 or the then outstanding amount due under the Secured Promissory Note (whichever is less), or<br><br>(b) within thirty six months of the effective date of the Plan selling the property securing the Secured Promissory Note, and providing AME with 50% of the net proceeds of such sale, after deducting costs of sale, surveys, broker fee, litigation and other costs, provided that the total payment is equal to or greater than $1,000,000 or the then outstanding balance due under the Secured Promissory Note (whichever is less), or<br><br>(c) within sixty months of the effective date of the Plan, paying a lump sum of $1,750,000, or the then outstanding balance due under the Secured Promissory Note (whichever is less), or<br><br>(d) within sixty months of the effective date of the Plan, selling the property securing the Secured Promissory Note, and providing AME with 50% of the net proceeds of such sale after deducting costs of sale, surveys, broker fee, litigation and other costs, provided that the total payment is equal to or greater than $1,750,000 or the then outstanding balance due under the Secured Promissory Note (whichever is less).<br><br>Estimated Percentage Recovery:  60 % of aggregate face amount of debt |
| **Class 3 — U.S. Department of Education Secured Claim and Economic Development Authority Covenant**<br><br>Amount: | Class 3 consists of the secured claim held by the United States Department of Education and the covenant held by the Economic Development Authority.<br><br>The Class 3 Secured Claims are secured by real property commonly known as the John Lewis Gymnasium |

7

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| $1,153,777.32 and $480,000, respectively | and are Impaired. The Holders of the Allowed Class 3 Secured Claims shall receive an aggregate payment from the Sale Proceeds of $1,000,000, in full satisfaction, settlement, release, extinguishment and discharge of such Class 3 Secured Claims and all Liens associated therewith.<br><br>Estimated Percentage Recovery: unknown |
| **Class 4 - Fieri Facias Liens of Commerce and Industry Insurance Company**<br><br>Settlement Amount: $1,000 | Class 4 Secured Claims consist of the Fieri Facias Liens of Commerce and Industry Insurance Company. Class 4 Secured Claims are secured by the Debtor's Property generally, but only to the extent of the value of such Property after payment of senior liens.<br><br>Class 4 Secured Claims are Impaired. The Holder of an Allowed Class 4 Claim shall receive from the Carve Out, in full satisfaction, settlement, release, extinguishment and discharge of such Class 4 Secured Claim and all Liens associated therewith, $1,000, as agreed upon by and between the Debtor and the Claimant.<br><br>Estimated Percentage Recovery: 100% of Settlement Amount; 10.45% of Lien Amount. |
| **Class 5 — Mechanic's Lien of Commercial Plumbing, Inc.**<br><br>Settlement Amount: $3,500 | Class 5 Secured Claims consist of the Mechanic's Liens of Commercial Plumbing, Inc. for improvements to property commonly known as the Herndon Stadium.<br><br>Class 5 Secured Claims are secured by the Herndon Stadium and are Impaired. The Holder of an Allowed Class 5 Claim shall receive from the Carve Out, in full satisfaction, settlement, release, extinguishment and discharge of such Class 5 Secured Claim and all Liens associated therewith, $3,500, as agreed upon by and between the Debtor and each Claimant.<br><br>Estimated Percentage Recovery: 100% of Settlement Amount; 45.42% of Lien Amount. |
| **Class 6 — Mechanic's Lien of Premier Contract Carpet**<br><br>Settlement Amount: $10,000 | Class 6 Secured Claims consist of the Mechanic's Lien held by Premier Contract Carpet for improvements to property commonly known as the Herndon Stadium.<br><br>Class 6 Secured Claims are secured by the Herndon Stadium and are Impaired. The Holder of an Allowed Class 6 Secured Claim shall receive from the Carve Out, in full satisfaction, settlement, release, extinguishment and |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | discharge of such Class 6 Secured Claim and all Liens associated therewith, $10,000, as agreed upon by and between the Debtor and the Claimant.<br><br>    Estimated Percentage Recovery:  100% of Settlement Amount; 19.61% of Lien Amount. |
| **Class 7 — General Unsecured Claims**<br><br>Estimated Aggregate Allowed Amount:  Approximately $6,364,000 - $9,500,000 | Class 7 consists of Allowed General Unsecured Claims, which include all Claims against the Debtor, including Rejection Claims, that are not Administrative Claims, Priority Tax Claims, or Claims classified in Classes 1 through 6.<br><br>    Under the Plan, Allowed Class 7 General Unsecured Claims are Impaired.  Each Holder of a Allowed Class 7 General Unsecured Claim shall receive, in full satisfaction, settlement, release, extinguishment and discharge of such Claim a pro rata distribution the Residual of the Carve Out and any remaining Distributable Cash after payment of Administrative and Priority Claims and Claims in Classes 1 through 6 as set forth above.  It is estimated that the Residual and remaining Distributable Cash will be approximately $300,000.<br><br>    Estimated Percentage Recovery:  3-5 % |

    THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTOR AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

### III. PLAN VOTING INSTRUCTIONS AND PROCEDURES

**A.    Notice to Holders of Claims**

    Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims to make an informed judgment whether to accept or reject the Plan.

    THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

    IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE

BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  THUS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

No solicitation of votes may be made except after distribution of this Disclosure Statement and no person has been authorized to distribute any information concerning the Debtor other than the information contained herein.

**B.      Voting Rights**

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes that are (a) treated as "impaired" by the plan and (b) entitled to receive a distribution under such plan are entitled to vote on the plan.  In this Chapter 11 Case, under the Plan, only Holders of Claims in Classes 2 through 7 are entitled to vote on the Plan.  Claims in other Classes are Unimpaired and their Holders are deemed to have accepted the Plan.

Only Holders of Allowed Claims in the voting Classes are entitled to vote on the Plan.  A Claim that is unliquidated, contingent or disputed is not an Allowed Claim, unless and until the amount is estimated or determined, or the dispute is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction, or pursuant to agreement with the Debtor.  However, the Bankruptcy Court may deem a contingent, unliquidated or disputed Claim to be Allowed on a provisional basis, for purposes only of voting on the Plan.  The Debtor intends to allow Holders of Claims that are unliquidated, contingent or disputed to vote on the Plan and to count their Claims for voting purposes only as being in the amount of $1.00.

**C.      Solicitation Materials**

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtor will send to Holders of Claims who are entitled to vote copies of (a) the Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan and (d) other materials as authorized by the Bankruptcy Court.

If you are the Holder of a Claim that is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

**If by regular mail, overnight courier or hand delivery:**

DILWORTH PAXSON LLP
1500 Market St., Suite 3500 E

10

Philadelphia, PA 19102
Attn: Miriam Dolan

**If by telephone:**

Miriam Dolan
(215) 575-7100

**D.      Voting Procedures, Ballots and Voting Deadline**

After reviewing the Plan and this Disclosure Statement, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot.  You should complete and sign your original ballot (copies will not be accepted) and return it in the envelope provided.

Each ballot reflects the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the ballot or ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND <u>RECEIVED</u> NO LATER THAN _____ ___, 2015, AT 5:00 P.M. EASTERN TIME (THE "<u>VOTING DEADLINE</u>") BY THE FOLLOWING:

DILWORTH PAXSON LLP
1500 Market St., Suite 3500 E
Philadelphia, PA 19102
Attn: Miriam Dolan

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, FAXED BALLOTS WILL NOT BE ACCEPTED.  BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED.  BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL BE NULL AND VOID.  DO NOT RETURN ANY DEBT INSTRUMENTS OR OTHER EVIDENCE OF YOUR CLAIM WITH YOUR BALLOT.

Copies of this Disclosure Statement, the Plan and any appendices and exhibits to such documents are available from Debtor's counsel at the telephone number and address below.  If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

**If by regular mail, overnight courier or hand delivery:**

11

DILWORTH PAXSON LLP
1500 Market St., Suite 3500 E
Philadelphia, PA 19102
Attn: Miriam Dolan

**If by telephone:**

Miriam Dolan
(215) 575-7100

For further information and general instruction on voting to accept or reject the Plan, see Article XI of this Disclosure Statement and the instructions accompanying your ballot.

THE DEBTOR URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY VOTING IN FAVOR OF THE PLAN AND OTHERWISE COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

**E.      Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for February __, 2015 at ___ _.m. (prevailing Eastern time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Objections to confirmation of the Plan or proposed modifications to the Plan, if any, must (i) be in writing, (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (iii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party, (iv) state with particularity the basis and nature of any objection to the Plan and (v) be filed electronically, together with proof of service, with the United States Bankruptcy Court for the Northern District of Georgia, 75 Spring Street SW, Atlanta, Georgia 30303, www.ganb.uscourts.gov, and served on the parties listed in the Confirmation Hearing notice, in each case so as to be actually received on or before 5:00 p.m. (prevailing Eastern time) on February __, 2015.  Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

### IV. GENERAL INFORMATION CONCERNING THE DEBTOR

**A.      Overview**

The Debtor is a non-profit educational corporation that operates a historically black college with a rich cultural and educational history.  On October 15, 1881, just twenty years after Abraham Lincoln signed the Emancipation Proclamation, 107 students and nine teachers walked into a crude wooden structure at the corner of Boulevard and Houston Streets in Atlanta, Georgia, marking the opening of the first educational institution in Georgia under sole African-American patronage.  That institution was Morris Brown College.

While the Debtor has successfully operated for more than 130 years, having as many as 3,000 students at one time, financial difficulties and mismanagement in the early 2000's lead to the loss of the Debtor's accreditation and, thus, loss of eligibility for federal financial aid. This event proved nearly fatal to the college, despite rigorous efforts to rebuild outside of bankruptcy.

Despite the Debtor's efforts, in August of 2012, the Debtor was facing an imminent foreclosure action and was unable to demonstrate financial stability, one of the requirements necessary for the college to regain its accreditation. Further, the Debtor learned from the Internal Revenue Service that it had lost its 501(c)(3) tax exemption. Chapter 11 became the Debtor's only option to save the college from closure.

On August 25, 2012, the Debtor initiated this Chapter 11 case.

## B.    History

Morris Brown College was granted a charter by the State of Georgia in May 1881, to operate an institution for "the moral, spiritual and intellectual growth of Negro boys and girls." In its early days, Morris Brown College, with the support of the African Methodist Episcopal Church, developed programs to serve the needs of students from low socioeconomic backgrounds. The uniqueness of Morris Brown College is its institutional flexibility, based on the assumption that a college can serve the needs of all students with the desire and potential to earn a college degree. Its campus is conducive to well-balanced teaching methods geared toward the preparation, motivation and achievement of all of its students.

Like other historically black colleges and universities in the United States, Morris Brown College relies on a mix of earned and contributed income as well as federal financial aid. Generally, the College's total gross income is derived largely from contributed income and federal financial aid as well as from earned income (largely student tuition). A very small portion of the College's total gross income is derived from rental income flowing from various lease arrangements with third parties who utilize portions of the College's campus from time to time. For this reason, the loss of the College's accreditation was devastating to the long-term viability of the College.

As of the Petition Date, in an average year, about 40% of the College's total expenses directly related to faculty and staff expense, including salary and benefits. An additional 60% of all expenses related to other direct costs incurred as part of the College's operations, including utilities, security and maintenance.

## C.    Management and Employees

### 1.    *Management*

Dr. Stanley J. Pritchett, Sr., who joined the College in 2007, is the current President and Chief Executive Officer. Bishop Preston W. Williams, II currently serves as Chairman of the Board of Trustees. Lucius Williams has been the Chief Financial Officer since 2011. Robert Johnson serves as the Chief Operations Officer. No member of the College's current management, other than Robert Johnson, was involved with the College during the early 2000's when the mismanagement that resulted in the loss of accreditation occurred. In the early 2000's Robert Johnson was employed as Assistant Vice-President of Academic Affairs and was an

assistant professor.  He was not a member of the College Cabinet.  Current management has been charged with the task of restoring the financial stability of the College and will retain their positions with the Debtor following the Effective Date of the Plan, at the discretion and approval of the Debtor's Board of Trustees.

2.      *Employees*

As of the Petition Date, the Debtor employed a president, four vice presidents (two of whom have one support staff member each), one chief of staff, a chief financial officer (plus three support staff), a registrar (with two support staff), one financial aid officer and an administrative assistant to the president, for a total of seventeen staff employees (the "Staff Employees").  All Staff Employees are salaried employees.  The Debtor also employed two maintenance employees who are paid on an hourly basis (the "Maintenance Employees").  Additionally, the Debtor employs five full-time faculty members and sixteen part-time faculty members, all of whom are salaried employees (the "Faculty Employees," and, together with the Staff Employees and Maintenance Employees, the "Employees").

**D.      Summary of Assets**

The Debtor filed Schedules with the Bankruptcy Court that detail the Debtor's assets.  Such assets include cash on hand, bank accounts and investments, deposits, insurance policies, accounts receivable, real property and other items of personal property used by the Debtor in its operations.  The Schedules provide asset values on a net book basis, which are not reflective of actual values.  With respect to the Debtor's real property, values are given without consideration of any security or other interests held by creditors and parties in interest – most importantly the reversionary interest asserted by Clark Atlanta University in the vast majority of the Debtor's main campus, which may be triggered in the event that the Debtor (i) ceased operations or (ii) ceased utilizing the real property for educational purposes and may result in the reversion of many of the campus lots to Clark Atlanta University.  The Schedules may be reviewed on the Bankruptcy Court electronic case filing system or during business hours in the offices of the Clerk of the Bankruptcy Court.  Information regarding the Debtor's assets is also available in the Liquidation Analysis attached hereto as Appendix C.

**E.      Historical Financial Information**

Attached as Appendix D are the Debtor's audited financial statements for the fiscal year ended July, 2011 and unaudited financial statements for the fiscal year ended July, 2013.  The Debtor's largest liabilities relate to faculty and staff expenses and accrued benefits obligations as well as its historical obligations to the African Methodist Episcopal Church, Inc., U.S. Bank, National Association, and Georgia Power Company.

Subsequently to losing its accreditation in 2003, the Debtor has been forced to rely solely on student tuition and donations for survival.  Once it is recognized as a candidate for accreditation, approximately 12-18 months after achieving financial stability through successful emergence from Chapter 11,  the Debtor and its students will be eligible for federal financial aid.

14

It is anticipated that this eligibility will result in a significant increase in the number of students admitted to the Debtor's college as well as a significant increase in annual revenues.

## F.    The Debtor's Annual Operating Support

Prior to the Petition Date, the Debtor's donation level from alumni and other sources had declined significantly over the past decade as a result of several trends.  First, the Debtor believes that the revenue declines in contributed income are the result of both broader trends in the marketplace as well as College-specific challenges.  Years of economic recession has taken a toll.  However, the College also attributes some of the decline to declining enrollment and the prepetition loss of the Debtor's accreditation and tax exempt status.  Post-petition donations from alumni and other sources have stabilized and, in several instances, increased above levels that existed in recent history.

## G.    Events Leading to the Commencement of the Chapter 11 Case

In recent years, the Debtor has experienced a series of challenges stemming from factors including declining enrollment and revenues, loss of accreditation and tax exempt status, and increased operational costs.

As of the Petition Date, the Debtor faced significant unfunded payroll and tax liabilities as well as certain significant obligations owed to secured and unsecured creditors.  To address these outstanding obligations, the Debtor would need to achieve revenues or donations in excess of $30,000,000 above and beyond the cash available in the main operating budget.

Prior to the Petition Date, the Debtor's current management had been working with the Transnational Association of Christian Colleges and Schools ("TRACS") toward regaining its accreditation so that the Debtor and its student body would be eligible for federal financial aid.  The Debtor's current management was able to satisfy all but two of the requirements of TRACS.  The two remaining requirements were that the Debtor obtain a contract for library services and that the Debtor demonstrate financial stability – neither of which the Debtor could accomplish outside of Chapter 11 in light of the vast discrepancy between its revenues and expenses.

Additionally, prior to the Petition Date, a notice had apparently been sent to the Debtor from the Internal Revenue Service alerting the Debtor that its tax exempt status would be revoked if certain tax forms were not filed.  For an unknown reason, this notice was either not received or was not timely brought to the attention of current management and the Debtor lost its tax exempt status, effective retroactively to November of 2011.

As the Debtor's financial problems became increasingly evident, the Debtor responded in the short term by cutting faculty and staff, reducing and/or not paying salaries of remaining staff, and ramping up its fundraising efforts.  Shortly before the Petition Date, the Debtor's Board of Trustees made and obtained donations to pay the Debtor's outstanding trust fund tax obligations relating to the Debtor's prior payroll obligations; however, its fundraising efforts were hampered by the loss of the Debtor's tax exempt status.

In parallel, the Debtor was working with TRACS and contacted the Department of Education to ensure that a bankruptcy filing would be an acceptable means by which the Debtor

could become financially stable and achieve accreditation.

In spite of its efforts to raise sufficient revenues to stave off a bankruptcy filing, the Debtor's liquidity was depleted and Chapter 11 became the only avenue by which the Debtor could remain operational. Remaining operational is critical to the continued existence of the Debtor because the vast majority of its campus is subject to a reversionary interest held by Clark Atlanta University. Should the Debtor (i) cease operations, or (ii) cease utilizing the real property for educational purposes, much of the Morris Brown College campus would become property Clark Atlanta University.

## V.  THE CHAPTER 11 CASE

**A.    Continuation of Operations; Stay of Litigation**

On August 25, 2012, the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code. The filing initiated an automatic stay of a foreclosure proceeding being prosecuted by GTAS Asset Solutions, LLC, the entity holding bonds secured by certain of the Debtor's campus lots in which foreclosure sale was scheduled for September 4, 2012.

Since the Petition Date, the Debtor has continued to operate as debtor in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtor is authorized to operate its school and manage its property in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

**B.    First Day Motions**

On the first day of the Chapter 11 Case, the Debtor filed several applications and motions seeking certain relief by virtue of so-called "first day orders." Such motions sought, among other things, the following relief:

- the maintenance of the Debtor's bank accounts and operation of its cash management system substantially as such system existed prior to the Petition Date;

- payment of certain of the Debtor's employees' prepetition compensation, benefits and expense reimbursement amounts;

- authority to administer student programs and honor certain prepetition obligations to students; and

- approval of deposits to utility companies in exchange for prohibiting the utility companies from altering, refusing or discontinuing services post-petition on account of prepetition debt.

**C.    Retention of Professionals**

The Debtor is represented in the Chapter 11 Case by Dilworth Paxson LLP ("Dilworth") as lead counsel and The Moore Law Group, LLC as local counsel. The Debtor obtained its tax and audit services from BDO USA, Inc. ("BDO") and, on a temporary and pro bono basis, its financial advisory services from Deloitte Financial Services ("Deloitte").

16

**D.      Appointment of Creditors' Committee**

On September 27, 2012, the United States Trustee for the Northern District of Georgia appointed the official committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Case.  The Creditors' Committee retained Kilpatrick Townsend & Stockton LLP as its legal advisor.

**E.      Significant Post-Petition and Restructuring Events**

1.      *Payment of Trust Fund Taxes*

As of the Petition Date, the Debtor owed approximately $260,000 in unpaid trust fund taxes on account of payroll obligations.  The Debtor's Board of Trustees contributed sufficient funds to pay these obligations prior to the Petition Date and, on November 2, 2012, the Bankruptcy Court issued an order authorizing the Debtor's payment of outstanding trust fund taxes with pledged donations by third party donors.

2.      *Tax Exempt Status*

On the Petition Date, the Debtor filed its application for reinstatement of its 501(c)(3) tax exempt status.  The Debtor also requested that its status be considered on an expedited basis by the Internal Revenue Service.

After completing a series of document and information requests received from the Internal Revenue Service, the Debtor regained its tax exempt status on January 14, 2013 – effective retroactively to August 25, 2012.

3.      *Proposed Sale of Certain Assets*

Throughout the course of this Chapter 11 Case, the Debtor considered various options to resolve its financial challenges toward a successful reorganization, including asset sales, mergers, and similar ventures.  Prior to May of 2013, despite a series of inquiries and promises from individuals and entities, the Debtor had not been able to secure a viable transaction that would have allowed the Debtor to restructure its finances in such a way as to ensure the Debtor's continued existence as well as provide the best possible recovery for all creditors.

In May of 2013, the Debtor's Board of Trustees considered two proposals that were presented to it.  The Board met to review the terms of each proposal as well as the impact of each proposal on the Debtor's restructuring goals in the context of its fiduciary duty to maximize the value of its estate and select the course of action that was in the best interests of all of the Debtor's creditors.  The Debtor's management contacted TRACS to determine the ability of the Debtor to regain accreditation under each proposal and described each proposal generally to its major creditor constituencies.

The Board elected to pursue a transaction pursuant to which the Debtor intended to (a) sell certain parcels of real property that are not critical to the core operations of the Debtor's campus, at or above the market value for such property, (b) lease certain parcels of real property, and (c) obtain a significant charitable donation for future operations pending reaccreditation through TRACS.  This proposal was part of a larger transaction that also involved a sale to the buyer of certain properties previously foreclosed by U.S. Bank, National Association, as indenture trustee.

On June 27, 2013, the Debtor filed its original Chapter 11 plan of reorganization and a hearing on the Debtor's original Disclosure Statement was scheduled for August 1, 2013.

Shortly before the August 1, 2013 hearing, the Debtor was informed that the transaction involving the acquisition of the previously foreclosed property could not be consummated. As this transaction was fundamental to the consummation of the Debtor's original Chapter 11 plan, the failure of this portion of the transaction required the Debtor to amend its Chapter 11 plan.

Although the original Chapter 11 plan was conditioned on the closing of an integrated transaction involving estate and non-estate property, the buyer remained interested in working with the Debtor and agreed to revise its intended acquisition and go forward with a transaction that would not involve the acquisition of non-estate property. The African Methodist Episcopal Church, Inc., the creditor secured by much of the Debtor's campus, also came forward to offer a short-term financing facility as well as a proposal for additional funding to support an amended Chapter 11 plan.

Following the hearing on August 1, 2013, the Debtor discussed various alternative proposals and offers with its original buyer as well as The African Methodist Episcopal Church, Inc., and continued to reach out to other developers, persons and entities who may also have an interest in acquiring property from the Debtor pursuant to an amended plan of reorganization. As a result of media reports regarding the proposed relocation of the Atlanta Falcons' stadium that indicated a potential interest in some of the Debtor's property, the Debtor also reached out to the various parties involved in the relocation efforts to determine whether a proposal to the Debtor would be forthcoming. Following an evaluation of the offers made, the Debtor entered into an asset purchase agreement (subject to approval of the Bankruptcy Court and confirmation of the Plan) with WH Solis, LLC, pursuant to which WH Solis, LLC would purchase certain non-reversionary real property and acquire development rights on other property of the Debtor. The purchase was backed by local developers, Pope & Land Enterprises, Inc., as well as several individuals involved in various development projects in the City of Atlanta. Despite the Debtor's best efforts to consummate the sale to WH Solis, LLC, just prior to confirmation of the Debtor's first amended plan of reorganization, WH Solis, LLC insisted upon significant changes to the terms of the proposed sale, which changes made confirmation of the plan impossible.

Ultimately, the Debtor, in consultation with Clark Atlanta University, the Official Committee of Unsecured Creditors and The African Methodist Episcopal Church, Inc., retained Jones Lang LaSalle Americas, Inc. as its real estate broker to market the Debtor's property for sale pursuant to 11 U.S.C. § 363(b).

On June 23, 2014, in accordance with bid procedures approved by the bankruptcy court, the Debtor obtained approval to sell various parcels of its property to joint bidders, The Atlanta Development Authority and Friendship Baptist Church (the "Buyer"), for a total purchase price of $14,625,000.

The transaction with the Buyer is the highest offer received by the Debtor and allows the Debtor to retain sufficient property on which to continue operations for the benefit of its student body and the Atlanta community generally.

4.        *Sale of Certain Debt*

In connection with the resolution of pending litigation and claims held by U.S. Bank, National Association, as successor trustee for the Debtor's largest secured creditor as of the Petition Date, certain of the Debtor's secured creditors and the Debtor entered into a Settlement Agreement, which was subsequently approved by the Bankruptcy Court on November 4, 2013. Through this Settlement Agreement, among other things (a) AME acquired the debt and position held by U.S. Bank, National Association and its principals in exchange for the release of certain pending litigation and other claims held by U.S. Bank, National Association and its principals; (b) U.S. Bank, National Association and its principals received payment on account of its position as more fully described in the Settlement Agreement and a release of claims from AME, the Debtor and the estate; (c) the Debtor received title to the segment of the Herndon Stadium that was previously foreclosed by U.S. Bank, National Association and/or its principals such that the Herndon Stadium has been reunified and the Debtor received releases from U.S. Bank, National Association and its principals.

5.        *Debtor In Possession Financing*

To assist the Debtor with satisfying its ongoing operating and administrative expenses pending confirmation of the Plan, AME has agreed to provide short-term debtor-in-possession financing to the Debtor.  This financing, to the extent approved by the Bankruptcy Court will be repaid from the Sale Proceeds.

# VI. SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST THE DEBTOR AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## A.    Overall Structure of the Plan

Under the Plan, Claims against the Debtor are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated:  (a) the Claims in certain Classes will be reinstated or modified and receive distributions equal to the full amount of such Claims, (b) the Claims of certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims, and (c) the Claims in certain other Classes will receive no recovery on such Claims.  On the Effective Date and at certain times thereafter, the Debtor or the Distribution Agent will distribute cash and other property in respect of certain Classes of Claims as provided in the Plan.  The Classes of Claims against the Debtor created under the Plan, the treatment of those Classes under the Plan and the securities and other property to be distributed under the Plan are described below.

## B.    Classification and Treatment of Claims

Section 1122 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims (no Interests, as defined by the Bankruptcy Code, exist) into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to section 1123(a)(1), do not need to be classified).  The Debtor also is required, under section 1122 of the Bankruptcy Code, to classify claims against and interests in the Debtor into Classes that contain claims and interests that are substantially similar to the other claims and interests in such Class.

The Debtor believes that the Plan has classified all Claims in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim may challenge the Debtor's classification of Claims and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.

Except as to Claims specifically Allowed in the Plan, the amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and accordingly the total Claims ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and the nature of distributions to members of each Class are summarized below.  The Debtor believes that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims, taking into account the differing nature and priority of such Claims and the fair value of the Debtor's assets.  In the event any Class rejects the Plan, the Debtor will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as to any dissenting Class.  Section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all Impaired classes of claims and interests.  Although the Debtor believes that the Plan can be confirmed under section 1129(b) of the Bankruptcy Code,

20

there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

      1.    *Treatment of Unclassified Claims under the Plan*

          (a)        *Administrative Claims*

An Administrative Claim is a Claim for: (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Case asserted or arising under sections 503, 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary post Petition Date cost or expense of preserving the Debtor's Estate or operating the organization of the Debtor, (ii) any post Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtor in the ordinary course of its operations, (iii) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code, and (iv) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546 of the Bankruptcy Code, and (b) any fees or charges assessed against the Debtor's Estate under section 1930 of title 28 of the United States Code.

Under the Plan, Administrative Claims are Unimpaired. Unless otherwise provided for therein, each Holder of an Allowed Administrative Claim shall receive, from the Carve Out, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtor and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtor, or as the Bankruptcy Court may order.

Professionals, other than JLL, have agreed to reduce their respective Administrative Claims by up to 20% in order to aid confirmation of the Plan.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on or before the Effective Date by the Debtor.

Applications for compensation for services rendered and reimbursement of expenses incurred by Professionals from the Petition Date through the Effective Date shall be filed no later than forty-five (45) days after the Effective Date. Such applications shall be served on: (a) Morris Brown College at 643 Martin Luther King, Jr. Dr., Atlanta, GA 30314, (Attn: Dr. Stanley Pritchett, President); (b) Anne M. Aaronson, Dilworth Paxson LLP, 1500 Market Street, Suite 3500E, Philadelphia, PA 19102, counsel to the Debtor; (c) the Office of the United States Trustee; and (d) Matthew Levin, Kilpatrick Townsend & Stockton LLP, Suite 2800, 1100 Peachtree Street NE, Atlanta, GA 30309-4528, counsel to the Committee. Applications that are not timely filed will not be considered by the Court. The Debtor or the Distribution Agent may pay any Professional Fees and expenses incurred after the Effective Date without any application to the Bankruptcy Court.

          (b)        *Priority Tax Claims*

Priority Tax Claims are any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. Such Priority Tax Claims include Claims of

governmental units for taxes owed by the Debtor that are entitled to a certain priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.  The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements set forth in section 507(a)(8)(A) of the Bankruptcy Code, (b) property taxes meeting the requirements of section 507(a)(8)(B) of the Bankruptcy Code, (c) taxes that were required to be collected or withheld by the Debtor and for which the Debtor are liable in any capacity as described in section 507(a)(8)(C) of the Bankruptcy Code, (d) employment taxes on wages, salaries or commissions that are entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of section 507(a)(8)(D), (e) excise taxes of the kind specified in section 507(a)(8)(E) of the Bankruptcy Code, (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) of the Bankruptcy Code and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G) of the Bankruptcy Code.

Priority Tax Claims are Unimpaired.  Each Holder of an Allowed Priority Tax Claim shall receive, from the Carve Out and at the option of the Debtor in full satisfaction, settlement, release, extinguishment and discharge of such Priority Tax Claim: (a) the amount of such unpaid Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed, and (iii) a date agreed to by the Debtor and the Holder of such Priority Tax Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtor or as the Bankruptcy Court may order.  Prior to the Effective Date, the Debtor shall have the right to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature.

2.    *Treatment of Classified Claims under the Plan*

(a)    The treatment of Classes of Claims are set forth in section II. B. hereof.  No Interests exist; therefore, no Class of Interests is necessary.

(b)    The Sale Proceeds will be used to fund the treatment of Claims as set forth in the Plan.  In consideration for the releases set forth in the Plan, AME, as the holder of the senior secured debt, including through the acquisition of the position of U.S. Bank, National Association and its principals, has agreed to receive a total distribution of $10,500,000 on account of its Claims and retain its existing liens on the Debtor's remaining property.  AME has agreed that its interest in any or all of the remaining Sale Proceeds will be a Carve Out made available to fund distributions to Administrative, Priority and unsecured creditors as set forth in the Plan.

## C.    Reservation of Rights Regarding Claims

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtor's or the Distribution Agent's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.  The Debtor specifically reserves all rights, remedies, claims, defenses and Causes of Action.  With respect to the Debtor's initiation and resolution of Claim Objections, and making of Distributions from the Distribution Account following the

Effective Date of the Plan, Section 12.06 of the Plan provides for the establishment of an Oversight Committee to oversee these matters.

**D.    Allowed Claims, Distribution Rights and Objections to Claims**

   1.    *Allowance Requirement*

      Only Holders of Allowed Claims are entitled to receive distributions under the Plan. An Allowed Administrative Claim is a Claim or any portion thereof that has been Allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, that was incurred by the Debtor in the ordinary course of business during the Chapter 11 Case and as to which there is no dispute as to the Debtor's liability, or that has become Allowed by failure to object pursuant to Section 8.05 of the Plan. An Allowed Claim is such Claim or any portion thereof (other than an Administrative Claim) of (a) any Claim against the Debtor that has been listed by the Debtor in the Schedules, as such Schedules may have been amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (b) any Claim specifically allowed under the Plan, (c) any Claim the amount or existence of which has been determined or allowed by a Final Order, or (d) any Claim as to which a proof of claim has been timely filed before the Bar Date, provided that at the time of the Confirmation Date the Debtor has not identified such Claim as being objectionable in part or in whole and no objection to the allowance thereof has been filed by the Claims Objection Deadline; provided, however, that the term Allowed, with reference to any Claim, shall not include (x) any unliquidated claim or (y) interest or attorneys' fees on or related to any Claim that accrues from and after the Petition Date unless otherwise expressly provided for in the Plan.

   2.    *Timing of Distributions*

      Except as specifically set forth in the Plan, distributions will be made to Holders of Allowed Claims in accordance with Article III of the Plan. If a Claim is not an Allowed Claim as of the applicable distribution date, distributions will be made only if and when the Claim is Allowed, and then in accordance with Article III of the Plan and, with respect to the cure of defaults for assumed executory contracts and unexpired leases, Section 6.02 of the Plan, and in each case, subject to Article VIII of the Plan. Claims that are Allowed as of the Effective Date and are entitled to receive distributions under the Plan shall receive distributions on the Effective Date or as soon as reasonably practicable thereafter. Distributions to be made after the Effective Date shall be made on dates to be established by the Distribution Agent pursuant to the terms of the Plan, taking into account the establishment of reserves for Disputed Claims.

   3.    *Making of Distributions*

      Distributions to Holders of Allowed Claims will be made in accordance with Article III of the Plan. On the Effective Date, the Debtor shall deliver cash to the Distribution Agent, if any, who will deposit such cash into the Distribution Account. From the Distribution Account, the Distribution Agent or the Debtor, if no Distribution Agent is appointed, will make distributions in accordance with the Plan. The Distribution Agent or Debtor, as the case may be, shall be entitled to establish reserves for Disputed Claims to provide for payment of such Claims if and when Allowed. If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive any distribution, the Distribution Agent or the Debtors shall, as appropriate and

in lieu of making such distribution to such Holder, delay such distribution until the disposition thereof shall be determined by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

Distributions to Holders of Allowed Claims shall be made by the Distribution Agent: (a) at the address listed for the Holder on such Holder's Proof of Claim and, if no Proof of Claim was filed, at the last known addresses of such Holder, or (b) at the addresses set forth in any written notices of address changes delivered to the Debtor or the Distribution Agent.  If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Debtor or Distribution Agent is notified of such Holder's then current address prior to the entry of the Final Decree closing this Chapter 11 Case, at which time all missed distributions shall be made to such Holder without interest.

4.      *Failure to Negotiate Checks/Unclaimed Distributions*

Checks issued in respect of distributions under the Plan shall be null and void if not negotiated within ninety (90) days after the date of issuance.  Any amounts returned to the Debtor in respect of such non-negotiated checks shall be forwarded to (if necessary) and held by the Distribution Agent in the Distribution Account.  Requests for reissuance for any such check shall be made directly to the Distribution Agent by the Holder of the Allowed Claim prior to the entry of the Final Decree.  All amounts represented by any voided check will be held until the earlier of: (a) one (1) month after date on which the check is voided, or (b) the date on which the Bankruptcy Court enters the Final Decree, and all requests for reissuance by the Holder of the Allowed Claim in respect of a voided check are required to be made prior to such date. Thereafter, all such amounts shall be deemed to be Unclaimed Property, in accordance with Section 5.07 of the Plan, and all Holders of Claims in respect of void checks shall be forever barred, estopped and enjoined from asserting a claim to such funds in any manner against the Debtor or the Distribution Agent or their respective assets.

All Property distributed on account of Claims must be claimed prior to the date on which the Bankruptcy Court enters the Final Decree, or, in the case of a distribution made in the form of a check, must be negotiated and a request for reissuance be made as provided for in Section 5.07 of the Plan.  All Unclaimed Property will be retained by and will revert to the Debtor.  All full or partial payments made by the Debtor and received by the Holder of a Claim prior to the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of the Debtor or the Distribution Agent pursuant to the Plan.  Nothing contained in the Plan shall require the Debtor or the Distribution Agent to attempt to locate any Holder of an Allowed Claim other than by reviewing the records of the Debtor and any Claims filed in the Chapter 11 Case.  Pursuant to section 1143 of the Bankruptcy Code, all Claims in respect of Unclaimed Property shall be deemed Disallowed and the Holder of any Claim Disallowed in accordance with Section 5.07 of the Plan will be forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtor or the Distribution Agent, the Distribution Account or their respective assets.

5. *Objection Procedures*

Unless otherwise ordered by the Court after notice and a hearing, under the Plan, the Debtor shall have the exclusive right, in consultation with the Committee, to file objections to Claims (other than Claims specifically Allowed in the Plan) and shall serve a copy of each such objection upon the Holder of the Claim to which the objection is made as soon as practicable, but in no event later than the Claims Objection Deadline.  An objection to any Claim shall be deemed properly served on the Holder thereof if the Debtor effects service in any of the following manners:  (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Federal Rule of Bankruptcy Procedure 7004, (ii) by first class mail, postage prepaid, on the signatory on the proof of claim or interest or other representative identified in the proof of claim or interest or any attachment thereto, or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Case.

**E.   Disposition of Executory Contracts and Unexpired Leases**

1. *Contracts and Leases Deemed Rejected*

The Plan provides that Debtor's executory contracts and unexpired leases shall be deemed automatically rejected as of the Effective Date, except for any executory contract or unexpired lease that: (a) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) that is the subject of a motion to assume or reject pending on the Effective Date, (c) that is assumed, rejected or otherwise treated pursuant to Section 6.03 or Section 6.04 of the Plan, (d) that is listed on Schedule 6.02(a) of the Plan or, (e) as to which a Treatment Objection has been filed and properly served by the Treatment Objection Deadline.   Notwithstanding the foregoing, the Plan provides for the assumption of certain categories of leases and contracts as of the Effective Date:

(a)   insurance plans and workers' compensation plans;

(b)   certain indemnification obligations to directors, officers or employees employed by the Debtor on or after the Petition Date, unless such obligations are contained in an employment agreement that is itself rejected;

(c)   any leases, subleases or other agreements governing the use of a portion of the Debtor's campus where the Debtor is the landlord or lessor; and

(d)   certain Employee Agreements and Employee Benefits.

To the extent that the above-listed contracts, agreements, licenses, policies, programs and plans are executory contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless a Treatment Objection is timely filed and properly served, each of them will be deemed assumed (as modified or terminated) as of the Effective Date with a Cure of zero dollars.  However, notwithstanding anything else herein, at the discretion of the Debtor, the assumed executory contracts shall be subject to modification in accordance with the terms thereof.  Any Proposed Cure, or any amount owed as set forth in a Final Order on any Treatment Objection, shall not be satisfied out of the Distribution Account or the Distributable Cash, but rather, shall be satisfied only by other assets of the Debtor.

25

2.      *Schedule of Executory Contracts and Unexpired Leases*

The Debtor shall set forth its intended assumption of executory contracts and unexpired leases in Schedules 6.02(a) of the Plan, which shall be filed as specified in Article VI of the Plan. The Debtor reserves the right, on or prior to 3:00 p.m. (prevailing Eastern time) on the third Business Day immediately prior to the commencement of the Confirmation Hearing, (i) to amend Schedule 6.02(a) in order to add, delete or reclassify any executory contract or unexpired lease or amend a proposed assignment and (ii) to amend the Proposed Cure, in each case with respect to any executory contract or unexpired lease previously listed as to be assumed.

3.      *Assumption and Rejection Procedures and Resolution of Treatment Objections*

(a)      Proposed Assumption

With respect to any executory contract or unexpired lease to be assumed pursuant to any provision of the Plan or any Notice of Intent to Assume or Reject, unless an Assumption Party files and properly serves a Treatment Objection by the Treatment Objection Deadline, such executory contract or unexpired lease shall be deemed assumed as of the Assumption Effective Date proposed by the Debtor, without any further notice to or action by the Bankruptcy Court, and any obligation the Debtor may have to such Assumption Party with respect to such executory contract or unexpired lease under section 365(b) of the Bankruptcy Code shall be deemed fully satisfied by the Proposed Cure, if any, which shall be the Cure.  Any Cure required to be paid by the Debtor shall be paid from property other than that which is included in the Distribution Account.

(b)      Proposed Rejection

With respect to any executory contract or unexpired lease to be rejected pursuant to any provision of the Plan or any Notice of Intent to Assume or Reject, unless a Rejection Party files and properly serves a Treatment Objection by the Treatment Objection Deadline, such executory contract or unexpired lease shall be deemed rejected as of the Rejection Effective Date proposed by the Debtor without any further notice to or action by the Bankruptcy Court.

(c)      Resolution of Treatment Objections

Both on and after the Effective Date, the Debtor may, subject to the approval of the Bankruptcy Court, settle Treatment Objections (including by paying any agreed Cure amounts).

With respect to each executory contract or unexpired lease as to which a Treatment Objection is timely filed and properly served, subject to the approval of the Bankruptcy Court, shall resolve such Treatment Objection or, if necessary, schedule a hearing on such Treatment Objection and provide at least 14 calendar days' notice of such hearing to the relevant Assumption Party or Rejection Party.  Unless the Bankruptcy Court expressly orders or the parties agree otherwise, any assumption or rejection approved by the Bankruptcy Court notwithstanding a Treatment Objection shall be effective as of the Assumption Effective Date or Rejection Effective Date originally proposed by the Debtor or specified in the Plan.

Any Cure shall be paid as soon as reasonably practicable following the entry of a Final Order resolving an assumption dispute and/or approving an assumption from assets other than

those included in the Distribution Account, unless the Debtor files a Notice of Intent to Assume or Reject. No Cure shall be allowed for a penalty rate or default rate of interest, each to the extent not proper under the Bankruptcy Code or applicable law.

(d)    Rejection ClaimsAny Rejection Claim must be filed by the Rejection Bar Date.  Any Rejection Claim for which a Proof of Claim is not properly filed and served by the Rejection Bar Date shall be forever barred and shall not be enforceable against the Debtor, or its Estate or property. The Debtor may contest any Rejection Claim in accordance with the Plan.

4.    *Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases*

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to the occurrence of the Effective Date, constitute approval of the rejections and assumptions contemplated by the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease that is assumed pursuant to the Plan shall vest in and be fully enforceable by the Debtor in accordance with its terms as of the applicable Assumption Effective Date, except as modified by the provisions of this Plan, any order of the Bankruptcy Court authorizing or providing for its assumption, or applicable federal law.

The provisions (if any) of each executory contract or unexpired lease assumed pursuant to the Plan that are or may be in default shall be deemed satisfied in full by the Cure, or by an agreed-upon waiver of the Cure.  Upon payment in full of the Cure, any and all Proofs of Claim based upon an executory contract or unexpired lease that has been assumed in the Chapter 11 Case or under the terms of the Plan shall be deemed disallowed and expunged with no further action required of any party or order of the Bankruptcy Court.

5.    *Modifications, Amendments, Supplements, Restatements or Other Agreements*

Unless otherwise provided by the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed, whether or not such executory contract or unexpired lease relates to the use, acquisition or occupancy of real property, shall include (i) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests in real estate or rights in remedy related to such premises, unless any of the foregoing agreements has been or is rejected pursuant to an order of the Bankruptcy Court or is otherwise rejected as part of the Plan.

## F.    Means for Implementation of the Plan

1.    *Continued Existence/Structure*

Except as otherwise provided in the Plan, on the Effective Date, the Debtor shall continue to exist as a non-profit corporate educational entity organized under the laws of the State of Georgia.

2.      *Restructuring Distributions*

On or as of the Effective Date, the distributions provided for under the Plan shall be made by the Debtor from funds on hand that were (a) solicited from the Debtor's Board of Trustees and other donors for the purpose of funding the Plan, (b) derived from the Debtor's ongoing operations, and (c) obtained through the sale of assets pursuant to 11 U.S.C. § 363(b).

## G.    Confirmation and/or Consummation

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

1.      *Requirements for Confirmation of the Plan*

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Confirmation Hearing that the following requirements for confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtor or by a Person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtor has disclosed (a) the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, or officer of the Debtor under the Plan, and (b) the identity of any insider that will be employed or retained by the Debtor and the nature of any compensation for such insider.

- With respect to each Class of Claims, each Impaired Claim Holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims held by such Holder, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor liquidated on such date.

- The Plan provides that Administrative Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding five years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to

28

the Allowed Amount of such Claims, except to the extent that the Holder of any such Claim has agreed to a different treatment.

- If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor.

The Debtor believes that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of chapter 11 and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

Even if all of the foregoing are satisfied, if any Class of Claims is Impaired and votes to reject the Plan, the Debtor must satisfy the applicable "cramdown" standard with respect to that Class. Section 1129(b) of the Bankruptcy Code requires that the plan "not discriminate unfairly" and be "fair and equitable" with respect to such class. The Debtor does not anticipate that any Class of Claims will vote to reject the Plan. However, in the event any Class votes to reject the Plan, the Debtor believes it will satisfy the cramdown standards in section 1129(b) with respect to any such rejecting class.

2.   *Conditions to Confirmation Date and Effective Date*

The Plan specifies conditions precedent to the Confirmation Date and the Effective Date. Each of the specified conditions must be satisfied or waived in whole or in part by the Debtor, without any notice to parties-in-interest or the Bankruptcy Court and without a hearing.

## H.      **Effects of Confirmation**

1.   *Vesting of Assets*

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtor shall vest in the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges and other interests, except as otherwise specifically provided in the Plan, including, with respect to, Clark Atlanta University's reversionary interests. All Liens, Claims, encumbrances, charges and other interests shall be deemed fully released and discharged as of the Effective Date and, where applicable, receipt of payments provided pursuant to the Plan, except as otherwise provided in the Plan, including, with respect to, Clark Atlanta University's reversionary interests.

2.   ***Injunction***

(a)   **Claims**

**No Holder of a Claim against the Debtor may, on account of such Claim, seek or receive any payment or other distribution from, or seek recourse against, the Debtor, including the reorganized Debtor, or its property, except as expressly provided in the Plan. Accordingly, except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that no Holder of a Claim against the Debtor may, on account of such Claim, seek or receive any payment or other distribution from, or seek recourse**

against, the Debtor, the Distribution Agent or any of their respective property.  From and after the Confirmation Date, all Persons who have held, hold, or may hold Claims against the Debtor are permanently enjoined from taking any actions against the Debtor, the Distribution Agent, or any of their respective property, in order to collect, enforce, or recover on account of such Claims.

       (b)      **Exculpation and Limitation of Liability**

The Plan contains standard exculpation provisions applicable to certain of the key parties in interest with respect to their conduct in the Chapter 11 Case.  Specifically, the Plan provides that, neither the Debtor nor the Distribution Agent shall have or incur any liability to any Person, including, without limitation, any Holder of a Claim or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act taken or omission made in good faith in connection with, relating to, or arising out of, the Chapter 11 Case, filing, negotiating, prosecuting, administering, formulating, implementing, confirming or consummating the Plan, or the Property to be distributed under the Plan, including all post-petition activities leading to the promulgation and confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtor or this Chapter 11 Case, provided, however, that the exculpation will not apply to any act of gross negligence or willful misconduct.

     3.     *Releases and Discharge Injunction*

       (a)      **Releases by Debtor in Favor of Third Parties**

The Plan provides that, effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, in its individual capacity and as debtor in possession, will be deemed to have forever released, waived and discharged the Committee and its members and representatives from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtor or the Distribution Agent to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtor, taking place on or after the Petition Date and on or prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case, or the Plan. Additionally, in consideration for the debtor-in-possession financing and the Carve Out, Debtor, in its individual capacity, as debtor in possession, and on behalf of the estate, will be deemed to have forever released, waived and discharged The African Methodist

Episcopal Church, Inc. and the Indenture Trustee, their affiliates, agents and other representatives, from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtor or the Distribution Agent to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtor, taking place on or prior to the Effective Date in any way relating to the Debtor, its estate the Chapter 11 Case, or the Plan.

(b)        **Releases by Creditors of Claims**

The Plan provides that, effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, in consideration for the obligations of the Debtor under the Plan and the payments, contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Person that has held, currently holds or may hold a Claim, and any Affiliate of any such Person (as well as any trustee or agent on behalf of each such Person), shall be deemed to have forever waived, released and discharged the Debtor, its estate, its Property, and the Distribution Agent from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever (other than the right to enforce the performance of their respective obligations, if any, to the Debtor or the Distribution Agent under the Plan, and the contracts, instruments releases and other agreements delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case, the Plan or the Disclosure Statement other than Claims or liabilities arising out of or relating to any act or omission that constitutes a failure to perform the duty to act in good faith and where such failure to perform constitutes willful misconduct, gross negligence, or fraud; provided, that this Section 10.03(b) shall not release any Person from any Claim or Cause of Action existing as of the Effective Date, based on (x) the Internal Revenue Code or any other domestic state, city or municipal tax code, (y) any liability that the Person may have as an owner or operator of real property after Confirmation under the environmental laws of the United States or any domestic state, city or municipality or (z) any criminal laws of the United States or any domestic state, city or municipality. Additionally, in consideration for the debtor-in-possession financing and the Carve Out, each Person that has held, currently holds or may hold a Claim, and any Affiliate of any such Person (as well as any trustee or agent on behalf of each such Person), shall be deemed to have forever waived, released and discharged The African Methodist Episcopal Church, Inc. and the Indenture Trustee, their affiliates, agents and other representatives, from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities, whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or

31

contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtor, taking place on or prior to the Effective Date in any way relating to the Debtor or its estate.

(c)    <b>Discharge Injunction</b>

**The Plan further provides that, on the Effective Date, the Confirmation Order shall constitute an injunction permanently enjoining any Entity (excluding the Debtor) that has held, currently holds or may hold a Claim, demand, debt, right, Cause of Action or liability that is released pursuant to this Section 10.03 of the Plan from enforcing or attempting to enforce any such Claim, demand, debt, right, Cause of Action or liability against (1) the Debtor, (2) the Committee, (3) the Distribution Agent, (4) any member, trustee, officer, employee, agent, advisor, professional, representative or other person acting on behalf of the foregoing (1) through (3), or (5) any of the respective Property of any of the foregoing. In consideration for the extension of the debtor-in-possession financing and the Carve Out, the Confirmation Order shall constitute an injunction permanently enjoining any Person that has held, currently holds or may hold a Claim, demand, debt, right, Cause of Action or liability that is released pursuant to this Section 10.03 of the Plan from enforcing or attempting to enforce any such Claim, demand, debt, right, Cause of Action or liability against The African Methodist Episcopal Church, Inc. and the Indenture Trustee, their affiliates, agents and other representatives.**

4.    *Clark Atlanta University Reversionary Interest*

The Debtor acknowledges that Clark Atlanta University asserts a reversionary interest in certain parcels of the Debtor's campus pursuant to a deed restriction. This reversionary interest shall survive this Chapter 11 Case unaltered and Clark Atlanta University shall retain all of its alleged rights and remedies relating to its reversionary interest to the same extent and with the same force and effect as it existed on the Petition Date.

5.    *No Successor Liability*

Except as otherwise expressly provided in the Plan, the Debtor and the Distribution Agent do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify or otherwise have any responsibilities for any liabilities or obligations of the Debtor or any other party relating to or arising out of the operations of or assets of the Debtor, whether arising prior to, on, or after the Effective Date. The Distribution Agent is not, and shall not be, a successor to the Debtor by reason of any theory of law or equity, and shall not have any successor or transferee liability of any kind or character.

<b>I.        Retention of Jurisdiction</b>

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date exclusive jurisdiction of all matters arising out of, arising in or related to, the Chapter 11 Case to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

32

- issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

- hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

- hear and determine any motions, applications, adversary proceedings, contested matters and other litigated matters pending on, filed or commenced after the Effective Date that may be commenced by the Debtor thereafter, including Avoidance Actions, proceedings with respect to the rights of the Debtor to recover Property under sections 542, 543 or 553 of the Bankruptcy Code, or proceedings to otherwise collect to recover on account of any claim or Cause of Action that the Debtor may have.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtor, including with respect to the matters set forth above, nothing in the Plan shall prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

### J.        Amendment, Alteration and Revocation of Plan

The Debtor may alter, amend or modify the Plan in accordance with section 1127 of the Bankruptcy Code or as otherwise permitted at any time prior to the Confirmation Date.   After the Confirmation Date and prior to the substantial consummation of the Plan, and in accordance with the provisions of section 1127(b) of the Bankruptcy Code and the Bankruptcy Rules, the Debtor may, so long as the treatment of Holders of Claims under the Plan is not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, prior notice of such proceedings shall be served in accordance with Bankruptcy Rules 2002 and 9014.

The Debtor reserves the right, at any time prior to the earlier of Confirmation of the Plan to withdraw the Plan.  If the Plan is withdrawn, the Plan shall be null and void and have no force and effect.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

### K.        Plan Implementation Documents

The documents necessary to implement the Plan include the following:

- Order confirming the Plan entered by the Bankruptcy Court

- Executed Class 2 Note and Security Deed

## VII.    CERTAIN RISK FACTORS TO BE CONSIDERED

The Holders of Claims in Classes 2 through 7 should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.          General Considerations

The Plan sets forth the means for satisfying the Claims against the Debtor.  See Section II of this Disclosure Statement entitled "Classification and Treatment of Claims" for a description of the treatments of each class of Claims.  Certain Claims receive no distributions pursuant to the Plan.

### B.          Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtor, and that the value of distributions to dissenting Holders of Claims will not be less than the value such Holders would receive if the Debtor liquidated.  Although the Debtor believes that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  See Appendix C for a liquidation analysis of the Debtor.

### C.          Claims Estimations

There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct.  The actual Allowed amount of Claims likely will differ in some respect from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should any underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

### D.          Conditions Precedent to Consummation

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

### E.          Inherent Uncertainty of Financial Projections

The Projections set forth in Appendix B hereto have been prepared by management of the Debtor in consultation with their financial advisors and cover the projected operations of the Debtor through fiscal year 2016.  These Projections are based on numerous assumptions that are an integral part of the Projections, including confirmation and consummation of the Plan in accordance with its terms, realization of the operating strategy of the Debtor, success in soliciting donations from major benefactors, improvements of student enrollment, general business and economic conditions, reaccreditation, and other matters.  Certain additional material assumptions

34

are disclosed on Appendix B, and the Projections should be read in conjunction with these assumptions.

Although the Projections are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates underlying the Projections are subject to business, economic and competitive uncertainties and contingencies. Accordingly, the Projections are only the Debtor's educated, good faith estimates and are necessarily contingent in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and may increase over time. The projected financial information contained herein should not be regarded as a guaranty by the Debtor, the Debtor's advisors or any other Person that the Projections can or will be achieved. However, the Debtor believes that the Projections are credible and that there is a reasonable likelihood that the results set forth in the Projections can be achieved.

### F.        Certain Tax Considerations

There are a number of income tax considerations, risks and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in Article VIII regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtor and to Holders of Claims who are entitled to vote to accept or reject the Plan.

### VIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN ANTICIPATED U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS PROPOSED BY THE PLAN TO THE DEBTOR AND HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS SUMMARY IS PROVIDED FOR INFORMATION PURPOSES ONLY AND IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), TREASURY REGULATIONS PROMULGATED THEREUNDER, JUDICIAL AUTHORITIES, AND CURRENT ADMINISTRATIVE RULINGS AND PRACTICE, ALL AS IN EFFECT AS OF THE DATE HEREOF AND ALL OF WHICH ARE SUBJECT TO CHANGE OR DIFFERING INTERPRETATION, POSSIBLY WITH RETROACTIVE EFFECTS THAT COULD ADVERSELY AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.

THIS SUMMARY DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF ITS PARTICULAR FACTS AND CIRCUMSTANCES OR TO CERTAIN TYPES OF HOLDERS OF CLAIMS SUBJECT TO SPECIAL TREATMENT UNDER THE CODE (FOR EXAMPLE, NON-U.S. TAXPAYERS, FINANCIAL INSTITUTIONS, BROKER-DEALERS, INSURANCE COMPANIES, TAX-EXEMPT ORGANIZATIONS, AND THOSE HOLDING CLAIMS THROUGH A PARTNERSHIP OR OTHER PASS-THROUGH ENTITY). IN ADDITION, THIS SUMMARY DOES NOT DISCUSS ANY ASPECTS OF STATE, LOCAL, OR NON-U.S. TAXATION AND DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS THAT ARE UNIMPAIRED UNDER THE PLAN, HOLDERS OF CLAIMS THAT

ARE NOT ENTITLED TO VOTE UNDER THE PLAN, AND HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY UNDER THE PLAN.

THE TAX RULES DESCRIBED HEREIN ARE COMPLEX AND THEIR APPLICATION IS UNCERTAIN IN CERTAIN RESPECTS.  EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES (INCLUDING STATE, LOCAL AND NON-U.S.) OF THE PLAN TO SUCH HOLDER.

A SUBSTANTIAL AMOUNT OF TIME MAY ELAPSE BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE RECEIPT OF A FINAL DISTRIBUTION UNDER THE PLAN.  EVENTS SUBSEQUENT TO THE DATE OF THIS DISCLOSURE STATEMENT, SUCH AS ADDITIONAL TAX LEGISLATION, COURT DECISIONS, OR ADMINISTRATIVE CHANGES, COULD AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREUNDER.  NO RULING HAS BEEN OR IS EXPECTED TO BE SOUGHT FROM THE INTERNAL REVENUE SERVICE (THE "IRS") WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OR IS EXPECTED TO BE OBTAINED BY THE DEBTOR WITH RESPECT THERETO.

**To ensure compliance with United States Internal Revenue Service Circular 230, (a) any discussion of U.S. federal tax issues in this Disclosure Statement is not intended or written to be relied upon, and cannot be relied upon by Holders, for purposes of avoiding penalties that may be imposed on such Holders under the Code; (b) such discussion is written to support the promotion of the Plan; and (c) each Holder of a claim should seek advice based on such Holder's particular circumstances from an independent tax advisor.**

### A.        U.S. Federal Income Tax Consequences to the Debtor

As a non-profit organization, the Debtor shall incur no U.S. federal income tax obligations as a result of the confirmation and consummation of the Plan and distributions made thereunder.  The Debtor's tax-exempt status as an organization under section 501(c)(3) of the Internal Revenue Code shall remain unaffected by the Plan.

### B.        U.S. Federal Income Tax Consequences to Claim Holders

The U.S. federal income tax consequences to a Holder receiving, or entitled to receive, a payment in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the Holder's method of accounting, and its own particular tax situation. Because the Holders' Claims and tax situations differ, Holders should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

Among other things, the U.S. federal income tax consequences of a payment to a Holder may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a payment in repayment of the principal amount of a loan is generally not included in the gross income of an original lender.

The U.S. federal income tax consequences of a transfer to a Holder may also depend on whether the item to which the payment relates has previously been included in the Holder's gross income or has previously been subject to a loss or bad debt deduction.  For example, if a

36

payment is made in satisfaction of a receivable acquired in the ordinary course of a Holder's trade or business, the Holder had previously included the amount of such receivable payment in its gross income under its method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the payment should not result in additional income to the Holder but may result in a loss.  Conversely, if the Holder had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the Holder generally would be required to include the amount of the payment in income.

A Holder receiving a payment under the Plan in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (i) the amount of cash and the fair market value (if any) of any property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item.  The character of any income or loss that is recognized will depend upon a number of factors, including the status of the creditor, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the Claim.  This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Holder's trade or business for the performance of services or for the sale of goods or merchandise.  Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the Holder's hands.

Market discount is the amount by which a Holder's tax basis in a debt obligation immediately after its acquisition is exceeded by the adjusted issue price of the debt obligation at such time, subject to a *de minimis* exception.  A Holder generally is required to include gain on the disposition of a market discount debt instrument as ordinary income to the extent of the accrued market discount on the debt instrument.

### C.    Other Tax Matters

1.    *Information Reporting and Backup Withholding*

Certain payments or distributions pursuant to the Plan may be subject to information reporting to the IRS.  Moreover, such reportable payments may be subject to backup withholding (at the then applicable rate (currently 28%)) unless the taxpayer:  (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

37

2.     *Importance of Obtaining Professional Tax Assistance*

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## IX. FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A.     Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

To support its belief in the feasibility of the Plan, the Debtor has prepared and relied upon the Projections with respect to the Debtor's operations and fund raising capabilities post-confirmation, which are annexed to this Disclosure Statement as Appendix B.

The Plan contemplates that the Debtor will raise and receive certain revenues, gifts and other donations as of the Effective Date. These funds will ensure that the Debtor has sufficient cash to continue operations as and to the extent provided in the Plan, and that no further financial restructuring will be necessary in the foreseeable future. Accordingly, the Debtor believes that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Projections were developed by the Debtor's management in consultation with the Debtor's financial advisors and other professionals.

The Projections, however, are based upon numerous assumptions that are an integral part of the Projections, including, without limitation, confirmation and consummation of the Plan in accordance with its terms, realization of the Debtor's fundraising strategies, tuition revenues, reaccreditation within a twelve to eighteen month period following confirmation of the Plan, general business and economic conditions, competition, absence of material contingent or unliquidated litigation, indemnity or other claims, and other matters. To the extent that the assumptions inherent in the Projections are based upon future operational decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and the assumptions on which they are based are considered reasonable by the Debtor, the assumptions and estimates underlying the Projections are subject to organizational, economic and competitive uncertainties and contingencies. Accordingly, the Projections are only an educated, good faith estimate and are necessarily contingent in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and may be adverse. The Projections should therefore not be regarded as a guaranty by the Debtor or any other Person that the results set forth in the Projections will be achieved. The Projections were

prepared by the Debtor, and not by any of their creditors, and the Debtor's creditors make no representations concerning the reasonableness of the Projections. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The projected financial information contained herein and in the Projections should not be regarded as a representation or warranty by the Debtor, the Debtor's advisors or any other Person that the Projections can or will be achieved. The Projections should be read together with the assumptions set forth in the Projections and information in <u>Article VII</u> of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Projections. The Debtor, however, believes that the Projections are credible and that there is a reasonable likelihood that the results set forth in the Projections can be achieved.

The Debtor does not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of the Projections or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtor does not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: This Disclosure Statement and the financial projections contained herein and in the Projections include "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. All statements other than statements of historical fact included in this Disclosure Statement are forward-looking statements, including, without limitation, financial projections, the statements, and the underlying assumptions, regarding the timing of, completion of and scope of the current restructuring, the Plan, debt and equity market conditions, current and future economic conditions, the potential effects of such matters on the Debtor's operating strategy, results of operations or financial position, and the adequacy of the Debtor's liquidity. The forward-looking statements are based upon current information and expectations. Estimates, forecasts and other statements contained in or implied by the forward-looking statements speak only as of the date on which they are made, are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to evaluate and predict. Although the Debtor believes that the expectations reflected in the forward-looking statements are reasonable, parties are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Certain important factors that could cause actual results to differ materially from the Debtor's expectations or what is expressed, implied or forecasted by or in the forward-looking statements include developments in the Chapter 11 Case, adverse developments in the timing or results of the Debtor's business plan (including the time line to emerge from chapter 11), the timing and extent of changes in economic conditions, the level of student enrollment and availability of federal financial aid, and motions filed or actions taken in connection with the bankruptcy proceedings. Additional factors that could cause actual results to differ materially from the Projections or what is expressed, implied or forecasted by or in the forward-looking statements are stated herein in cautionary statements made in conjunction with the forward-looking statements or are included elsewhere in this Disclosure Statement.

### B.      Acceptance of the Plan

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, Holders of Claims in each of Classes 2 through 7 will have voted to accept the Plan only if two-thirds (⅔) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

### C.      Best Interests Test

As noted above even if a plan is accepted by each class of claims, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated.

To calculate the probable distribution to holders of each impaired class of claims if the debtor could be liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the reversionary interest held by Clark Atlanta University in the majority of the Debtor's real property, second, by the claims of secured creditors to the extent of the value of their collateral and, third, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and the chapter 11 case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid administrative expenses incurred by the debtors in their chapter 11 case that are allowed in the chapter 7 cases, litigation costs and claims arising from the operations of the debtor during the pendency of the chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and several unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such

probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

### D.    Liquidation Analysis

The Debtor operates a non-profit organization.  As such, it generally cannot be forced to liquidate under chapter 7 of the Bankruptcy Code and, in the event that it was unable to confirm a chapter 11 plan, would be subject to dismissal of its Chapter 11 Case.  In the event of dismissal, or in the event of liquidation, the Debtor would be left with insufficient funds to sustain operations and would need to cease operating and dissolve under state law.

Although not entirely applicable to non-profit entities, for purposes of the best interests test, the Debtor, with the assistance of their financial advisors, prepared a liquidation analysis, annexed hereto as Appendix C (the "Liquidation Analysis"), which concludes that if a forced liquidation of the Debtor's assets under chapter 7 could occur, the aggregate value to be realized by the Debtor's estates would be approximately $0 (net of Clark Atlanta University's reversionary interest in the Debtor's real property).  All such value would be distributed to Holders of Allowed Secured Claims and no other Holder of a Claim, including unpaid Administrative and Priority Claims incurred during the administration of the Debtor's Chapter 11 Case, would receive a distribution.  These conclusions are premised upon the assumptions set forth in Appendix C, which the Debtor and its financial advisors believe are reasonable.

The Debtor believes that any liquidation analysis with respect to the Debtor is inherently speculative.  The Liquidation Analysis for the Debtor necessarily contains estimates of the net proceeds that would be received from a forced sale of assets, as well as the amount of Claims that would ultimately become Allowed Claims.  Claims estimates are based solely upon the Debtor's books and records and Claims filed to date in this case.  No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis.  In preparing the Liquidation Analysis, the Debtor has projected an amount of Allowed Claims that represents an estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims.  The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

### E.    Application of the "Best Interests" of Creditors Test

It is impossible to determine with certainty the value each Holder of a Claim will receive under the Plan as a percentage of any Allowed Claim.  Notwithstanding the difficulty in quantifying recoveries with precision, the Debtor believes that the financial disclosures and projections contained herein imply the greatest potential recovery to Holders of Claims in Impaired Classes.  Accordingly, the Debtor believes that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

### F.    Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

In the event any Class of Impaired Claims rejects the Plan, the Debtor may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  The Bankruptcy Court may confirm a plan at the request of a debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.  The Debtor believes the Plan does not discriminate unfairly with respect to the Claims in Classes 2 through 7.

A plan is "fair and equitable" as to holders of unsecured claims that reject the plan if the plan provides either that:  (a) each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtor believes that it could, if necessary, meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims in Classes 2 through 7.  No person nor entity holds an equity interest in the Debtor; therefore, no Class of Interests is necessary.

## X.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan affords Holders of Claims in Classes 2 through 7 the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such Holders.  If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) dismissal of the Debtor's Chapter 11 Case.

### A.        Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtor (or, if the Debtor's exclusive periods in which to file and solicit acceptances of a plan of reorganization have expired, any other party in interest) could attempt to formulate and propose a different plan or plans of reorganization.  Such a plan or plans might involve either a reorganization and continuation of the Debtor's organization or an orderly liquidation of assets.

The Debtor believes that the Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

### B.    Liquidation

If no plan is confirmed, the Debtor may be forced to liquidate outside of bankruptcy or to convert to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  It is impossible to predict with certainty how the proceeds of the liquidation would be distributed to the respective Holders of Claims against the Debtor.    However, the Debtor believes these proceeds would go entirely to secured, administrative and priority claims, leaving nothing for distribution to general unsecured claims.

The Debtor further believes that a liquidation would cause a substantial diminution in the Debtor's Estate given (i) the fact that it is relying upon donations and ongoing tuition revenues to fund its reorganization, sources which would become unavailable in the event of a cessation of operations, (ii) the fact that the vast majority of its real property would automatically revert to the ownership of Clark Atlanta University in the event of a cessation of operations, and (ii) the substantial premium in the distribution value pursuant to the Plan over the liquidation value of its assets, as well as the additional administrative expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee.  Importantly, if the Plan is not confirmed, the post-effective date letter of credit funding for future operations would not be available.   The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtor's assets.

## XI. THE SOLICITATION; VOTING PROCEDURES

### A.    Parties in Interest Entitled to Vote

In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (b) the claim or interest is "impaired" by the plan but entitled to receive or retain property under the plan.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

### B.    Classes Entitled to Vote to Accept or Reject the Plan

Holders of Claims in Classes 2 through 7 are entitled to vote to accept or reject the Plan. By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan,

43

therefore, the Holders of Claims in such Unimpaired Classes are not entitled to vote to accept or reject the Plan. Consequently, Class 1 is deemed to have accepted the Plan, therefore, none of the Holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

### C.    Solicitation Order

Upon approval of this Disclosure Statement, the Bankruptcy Court entered an order that, among other things, determines the dates, procedures and forms applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order"). Parties in interest may obtain a copy of the Solicitation Order through the Bankruptcy Court's electronic case filing system or by making written request upon the Debtor's counsel.

### D.    Waivers of Defects, Irregularities, Etc.

All questions with respect to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of ballots will be determined by the Bankruptcy Court. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to Debtor's counsel prior to the Voting Deadline. The Debtor reserves the absolute right to contest the validity of any such withdrawal. The Debtor also reserves the right to seek rejection of any and all ballots not in proper form. The Debtor further reserves the right to seek waiver of any defects or irregularities or conditions of delivery as to any particular ballot. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) may be invalidated by the Bankruptcy Court.

### E.    Withdrawal of Ballots; Revocation

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to Debtor's Counsel at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (a) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (b) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (c) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (d) be received by the Debtor's Counsel in a timely manner *via* regular mail or overnight courier, at Dilworth Paxson LLP, 1500 Market St., Suite 3500E, Philadelphia, PA 19102, Attn: Miriam Dolan. As stated above, the Debtor expressly reserves the absolute right to contest the validity of any withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Debtor's Counsel will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to Debtor's Counsel prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to Debtor's Counsel prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

### F.        Voting Rights of Disputed Claimants

Holders of Disputed Claims in Classes 2 through 7 whose Claims are asserted as wholly unliquidated, are subject to objection by the Debtor or are wholly contingent in Proofs of Claim (collectively, the "Disputed Claimants") are not permitted to vote on the Plan except as provided in the Solicitation Order.  Pursuant to the procedures outlined in the Solicitation Order, Disputed Claimants may obtain a ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims temporarily Allowed for voting purposes (a "Rule 3018 Motion").  Any such Rule 3018 Motion must be filed and served upon the Debtor's counsel no later than 5:00 p.m. (Eastern time) on the fourteenth (14th) day after the later of (i) the Solicitation Date and (ii) the date of service of an objection, if any, to such claim.  The ballot of any creditor filing such a motion will not be counted unless temporarily allowed by the Bankruptcy Court for voting purposes, after notice and a hearing.  Any party timely filing and serving a Rule 3018 Motion will be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan.  If and to the extent that the Debtor and such party are unable to resolve the issues raised by the Rule 3018 Motion prior to the Voting Deadline established by the Bankruptcy Court, then at the Confirmation Hearing the Bankruptcy Court will determine whether the provisional ballot should be counted as a vote on the Plan.  Nothing herein affects the Debtor's right to object to any Proof of Claim.  Any Claim that is a Disputed Claim by virtue of being subject to a claim objection filed by the Debtor that was pending at the time that the Disclosure Statement was approved by the Bankruptcy Court and remains disputed as of the Voting Deadline shall be permitted to submit a ballot to accept or reject the Plan; however, the ballot of such Claim shall be deemed to be $1.00 for purposes of voting only.

### G.        Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim or about the package of materials you received, or if you wish to obtain an additional copy of the Plan or this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact Debtor's Counsel at:

**If by regular mail, overnight courier or hand delivery:**

DILWORTH PAXSON LLP
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Attn:  Miriam Dolan

**If by telephone:**

Miriam Dolan
(215) 575-7100

### RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently,

45

the Debtor urges all Holders of Claims in Classes 2 through 7 to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before ___ __, 2015, at 5:00 p.m. prevailing Eastern time.

December 21, 2014

MORRIS BROWN COLLEGE

By:  /s/

Name: Dr. Stanley J. Pritchett

Title:   President, Morris Brown College

46